UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN SEXTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:18 CV 1318 ACL |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff Bryan Sexton brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his application for Supplemental Security Income under Title XVI of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Sexton's severe mental impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

## I. Procedural History

Sexton filed his application for benefits on August 10, 2015,[2] claiming that he became unable to work on March 6, 2014. (Tr. 170-75.) In his Disability Report, Sexton alleged disability due to Asperger's syndrome, anxiety in public, confusion with directions, sensitivity to extreme heat, hallucinations, high blood pressure, and depression. (Tr. 191.) Sexton was 28 years of age on his alleged onset of disability date. (Tr. 26.) His application was denied initially. (Tr. 95-106, 109-13.) Sexton's claim was denied by an ALJ on October 13, 2017. (Tr. 15-27.) On June 11, 2018, the Appeals Council denied Sexton's claim for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Sexton argues that "the ALJ erred by formulating an RFC not supported by substantial evidence in that the ALJ did not properly weigh the medical opinions of record." (Doc. 16 at p. 7.)

## II. The ALJ's Determination

The ALJ first found that Sexton did not engage in substantial gainful activity since August 10, 2015, the application date. (Tr. 17.) The ALJ next found that Sexton had the following severe impairments: psychosis not otherwise specified; major depressive disorder; intermittent explosive disorder; Asperger's syndrome, also diagnosed as autism spectrum

---

[2]Sexton previously filed applications for benefits, the most recent of which alleged an onset of disability date of August 1, 2010. (Tr. 72-88.) The application was denied by an ALJ on March 6, 2014. *Id.* The Appeals Council denied Sexton's request for review on June 17, 2015. (Tr. 89-94.) Thus, the issue of disability through March 6, 2014 is *res judicata*. *See Boock v. Shalala*, 48 F.3d 348, 351 (8th Cir. 1995).

disorder; and history of attention deficit hyperactivity disorder ("ADHD"). (Tr. 17-18.) The ALJ found that Sexton did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 18.)

As to Sexton's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with nonexertional limitations. Specifically, the claimant can understand, remember, and carry out simple instructions consistent with routine, repetitive unskilled work at SVP 1 and SVP 2. He can maintain attention to tasks for periods of 2-hour segments. He can tolerate occasional contact with co-workers and supervisors, but no contact with the general public, in a setting where he completes tasks relatively independently and where social interaction is not a primary job requirement, in an occupation where there are no strict production quotas and he would not be subject to the demands of fast-paced production work (i.e., work by the shift, not by the hour). He can perform simple decision making related to basic work functions. He can tolerate minor, infrequent changes in the workplace. He would likely be off task about 5 percent of the workday.

(Tr. 21.)

The ALJ found that Sexton had no past relevant work, but was capable of performing jobs existing in significant numbers in the national economy, such as automobile detailer, landscape specialist, and spiral binder. (Tr. 26.) The ALJ therefore concluded that Sexton was not under a disability, as defined in the Social Security Act, since August 10, 2015. *Id.*

The ALJ's final decision reads as follows:

> Based on the application for supplemental security income protectively filed on August 10, 2015, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 27.)

## III. Applicable Law

### III.A. Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

Page 4 of 20

claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

### III.B. Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social

Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled,

regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant

numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal

the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

Sexton argues that the ALJ erred in evaluating the medical opinion evidence. He contends that the RFC formulated by the ALJ is therefore not supported by substantial evidence.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)). The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785-86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions. *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012). Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion. 20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the physician provides support for his findings, whether other evidence in the record is consistent with the physician's findings, and the physician's area of specialty. 20

C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5).

Sexton argues that the ALJ erred in discounting the opinion of treating psychiatrist Sreekant Kodela, M.D. Dr. Kodela completed a Medical Source Statement-Mental on April 19, 2017, in which he indicated Sexton had diagnoses of major depressive disorder and autism spectrum disorder. (Tr. 471.) He found that Sexton would likely be "off task" fifteen percent of the time, and would miss four days of work a month due to his mental conditions. *Id.* Dr. Kodela expressed the opinion that Sexton was markedly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 472.) He found that Sexton was moderately limited in the following areas: ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. *Id.* Dr. Kodela found that Sexton was only mildly limited in all other areas. *Id.*

The ALJ stated that the mild and moderate limitations found by Dr. Kodela are consistent with the longitudinal record. (Tr. 24.) She indicated that she was assigning "little weight" to Dr. Kodela's opinion that Sexton had a marked limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; as well as Dr. Kodela's related opinion that Sexton would be absent from work more than four days a month and "off task" fifteen percent of the time. (Tr. 25.) The ALJ explained that the

"routine nature of the treatment obtained by the claimant and his demonstrated interest in vocational rehabilitation and job access, as well as his response to treatment during the relevant period, does not support such a finding." *Id.* Additionally, the ALJ noted that Dr. Kodela assessed GAF scores ranging from 54 to 62[3] during the relevant period, indicating mild to moderate limitations in functioning. *Id.*

On April 8, 2014, Sexton's first visit with Dr. Kodela during the relevant period, Sexton reported he was "doing pretty well." (Tr. 331.) Dr. Kodela summarized Sexton's medical treatment history, noting he had a long history of anxiety, depression, and anger issues. *Id.* Sexton also reported occasional auditory hallucinations of hearing his name called and the sound of someone driving up his driveway. *Id.* He was a high school graduate and received some special services in school. *Id.* Sexton functioned within the average range of cognitive ability but struggled with interpersonal difficulties. (Tr. 272.) He lived with his mother and attended psychosocial rehabilitation ("PSR") at Pathways. (Tr. 331.) Sexton had initially been resistant to the idea of medications, but had started taking venlafaxine[4] and "was tolerating it well and found it useful." *Id.* Sexton reported no depression or anxiety symptoms, some insomnia, and no anger problems. *Id.* Upon examination, Sexton was well-dressed and groomed; established

---

[3]Global assessment of functioning (GAF) is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders*, 32-34 (4th ed. rev. 2000). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. *Id.* at 32.

[4]Venlafaxine, generic for Effexor, is indicated for the treatment of depression, anxiety, panic attacks, and social anxiety disorder. *See* WebMD, http://www.webmd.com/drugs (last visited September 13, 2019).

good eye contact and rapport; was calm and relaxed; exhibited no agitation or aggression; was cheerful; his speech was normal; his mood was described as fair; his affect was euthymic with normal range and reactivity; his thought process and content was devoid of any paranoia or psychotic symptoms, hopelessness or worthlessness, or formal thought disorder; and his attention, concentration, insight, and judgment were fair. (Tr. 332.) Dr. Kodela diagnosed Sexton with psychosis NOS, major depressive disorder, and intermittent explosive disorder by history; and assessed a GAF score of 54. (Tr. 333.) He continued Sexton's medication, and encouraged him to seek paid employment. *Id.* Dr. Kodela's findings on examination, diagnoses, and recommendations remained unchanged on August 7, 2014. (Tr. 334-36.) On October 30, 2014, Sexton reported that he was still doing pretty well. (Tr. 337.) He reported some "minimal" depression symptoms and his affect was more subdued on examination. (Tr. 338.) Dr. Kodela assessed a GAF score of 53 and continued Sexton's medications. (Tr. 340.) In January 2015, Sexton reported that he was continuing to do well. (Tr. 341.) He denied any current depression but reported some anxiety and occasional insomnia, but not enough to cause significant dysfunction. *Id.* Sexton reported that he was getting along pretty well with his mother. *Id.* Upon examination, Sexton was quite relaxed and forthcoming, described his mood as good, and his affect was stable with normal range and reactivity. *Id.* Dr. Kodela stated that Sexton's condition had not changed in several months and he "seems pretty stable." *Id.* He assessed a GAF score of 57 and continued Sexton's medications. (Tr. 342.) In July 2015, Sexton reported that he was continuing to do well. (Tr. 344.) He was learning to train dogs and was trying to get a job. *Id.* Dr. Kodela's findings on examination remained unchanged from his last visit. *Id.* Dr. Kodela assessed a GAF score of 62 and continued Sexton's medications. (Tr. 345.) In December 2015, Sexton reported that he was doing well and was

"happy with [the] status quo." (Tr. 378.) He was excited that he had gotten his class E driver's license and was looking for a driving job. *Id.* He was not hearing any voices or sounds, not experiencing any mood swings, and felt stable. *Id.* On March 24, 2016, Sexton reported that he was doing "ok." (Tr. 381.) He had started working at McDonald's in October and work was going well. *Id.* Sexton indicated that he feels lonely at times but had no further depression and his anxiety was under control. *Id.* He also discussed his discomfort with sexual arousal and his thoughts about castration. *Id.* Sexton denied any intent to perform castration himself. *Id.* On examination, Sexton's mood was good and his affect was stable. *Id.* Dr. Kodela assessed a GAF score of 58. (Tr. 382.) Dr. Kodela continued Sexton's medications and recommended he work with a therapist. *Id.* In April 2016, Sexton reported a significant increase in irritability, anxiety, and depression due to stress at work. (Tr. 384.) He indicated that people "snub him when he tries to be friendly" at work and this upsets and angers him. *Id.* Upon examination, Sexton was subdued, anxious, and depressed, although his affect was stable. *Id.* Dr. Kodela assessed a GAF score of 55. (Tr. 385.) He adjusted Sexton's medications and encouraged him to attend therapy. *Id.* In May of 2016, Sexton reported he had started a new job and it was going well. (Tr. 394.) He had also started therapy and was happy with it. *Id.* Sexton denied anxiety, panic attacks, mood swings, or anger, and felt stable. *Id.* Sexton was calmer and more relaxed on examination and his affect was stable. *Id.* In July, Sexton reported experiencing a bit more depression but his anxiety was much better and he felt stable. (Tr. 411.) Dr. Kodela noted that Sexton had left his job at McDonald's due to work stress. *Id.* In September, Sexton reported that he had been going to vocational rehabilitation and was trying to get a job. (Tr. 430.) His depression has been better, his anxiety was "ok," and he felt stable. *Id.* On December 8, 2016, Sexton reported that he was happy with the status quo. (Tr. 452.)

He was spending time with family and still going to vocational rehabilitation. *Id.* His depression and anxiety were "ok," he had no anger, his sleep was good, he heard no sounds or voices, and he felt stable. *Id.* Dr. Kodela continued Sexton's medications. (Tr. 453.)

The ALJ's findings that Sexton responded well to treatment and demonstrated an interest in obtaining a job are supported by the treatment notes summarized above. The undersigned notes that the ALJ accepted and incorporated into the RFC the majority of Dr. Kodela's opinions. The only opinions of Dr. Kodela the ALJ did not accept were the marked limitation in Sexton's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the opinions that Sexton would be absent from work more than four days a month and would be "off task" fifteen percent of the time. (Tr. 25.) Dr. Kodela's treatment notes do not support the presence of these severe restrictions. Instead, they demonstrate that Sexton occasionally complained of depression, anxiety, or irritability due to various stressors, but examinations consistently showed few abnormalities and noted a stable affect and thought process devoid of any psychotic symptoms. Sexton generally reported that he was doing well, was stable on medication, and was happy with the status quo. Dr. Kodela encouraged Sexton to seek paid employment in April 2014, and Sexton worked at McDonald's from October 2015 until May 2016. After leaving this position, Sexton actively worked with vocational rehabilitation to find another job. Further, as noted by the ALJ, the GAF scores assessed by Dr. Kodela ranged from 54 to 62, indicating only mild to moderate limitations in functioning. There is no evidence in Dr. Kodela's treatment notes that Sexton suffered marked limitations in his concentration or ability to perform activities within a schedule or that he would require frequent absences. The fact that Sexton was able to maintain employment for an extended period and attend frequent vocational rehabilitation appointments without any

documented difficulties belies Dr. Kodela's opinions. The ALJ did not err in discounting portions of Dr. Kodela's opinions that were inconsistent with his own treatment notes.

The remainder of the medical evidence is also consistent with the presence of only mild to moderate limitations. Sexton began receiving counseling services at Pathways in April 2016, in order to help him manage his anxiety related to social situations. (Tr. 387-88.) He reported difficulty socializing with his peers at work because he did not know how to interact with them and feared they were talking about him. (Tr. 391.) In June 2016, Sexton indicated that he had quit his job at McDonald's because his supervisor had been degrading and unprofessional to him by calling him "stupid." (Tr. 398.) He reported he had applied for jobs driving taxis and was searching for other driving jobs. *Id.* Sexton indicated that he thought he could work as a driver because he could handle new people in small groups of one or two. (Tr. 400.) In July 2016, Sexton reported that he had scheduled an appointment with Vocational Rehabilitation to continue his job search. (Tr. 417.) In August 2016, Sexton reported that his anger was not as bad as it used to be and that his medications help control his moods. (Tr. 425.) In September and October 2016, Sexton reported feeling irritable because his mother was micromanaging him. (Tr. 437.) He indicated that he planned to get an application from the housing authority so he could move out and live on his own. (Tr. 445.) At his next visit on November 17, 2016, Sexton indicated that his mother does not want him to move out, so she hid the application and refused to give him the records he needed to complete it. (Tr. 447.) His mother advised him to not do anything and wait for his disability application to be approved. *Id.* Sexton continued his search for a job with the assistance of Vocational Rehabilitation in December 2016. (Tr. 449, 455.) Sexton had participated in a job shadowing experience in January 2017, but it did not

work out because the employees at the store were too busy to work with him. (Tr. 463.) He planned to arrange another job shadowing experience. *Id.*

Sexton also saw Christine G. Durbin, FNP, for various physical impairments during the relevant time. (Tr. 349-66.) The ALJ accurately noted that the mental status examinations Nurse Durbin performed were generally within normal limits, with only a few exceptions. (Tr. 23, 349-66.) For example, in June 2016, Nurse Durbin indicated that Sexton was "down" due to just losing his job at McDonald's and was nervous on examination. (Tr. 355.) Sexton reported that he experiences occasional highs and lows, but feels his medication is working for him. (Tr. 356.) On March 7, 2017, Nurse Durbin noted Sexton was cooperative, exhibited good eye contact, was less nervous, was relaxed, he brought topics up, and seemed to want to share information. (Tr. 349.)

The ALJ also considered the opinion of the state agency psychological consultant, Stanley Hutson, Ph.D. On October 15, 2015, Dr. Hutson expressed the opinion that Sexton had mild restriction of his activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 99.) Dr. Hutson found that Sexton retains the ability to understand and remember simple instructions; carry out simple work instructions; maintain adequate attendance and sustain an ordinary routine without special supervision; interact adequately with peers and supervisors in a work setting where demands for social interaction are not primary job requirements; and can adapt to most changes in a competitive work setting. (Tr. 103.) In support of his opinions, Dr. Hutson summarized the medical evidence and Sexton's daily activities, noting Sexton was doing well on medication, was trying to get a job and training dogs, and had significant daily activities but some issues with concentration, getting along with others, and handling stress. (Tr. 100.)

The ALJ indicated that she was assigning "mostly great weight" to Dr. Hutson's opinion. (Tr. 24.) The ALJ explained that Dr. Hutson provided a detailed narrative, outlining the basis of his opinions based upon the evidence available to him at that time. (Tr. 99-100.) The ALJ noted that she had formulated a somewhat more limited RFC in light of additional evidence available at the hearing, including Sexton's testimony. (Tr. 24.)

The ALJ did not err in assigning weight to Dr. Hutson's opinion. *See* 20 C.F.R. § 416.913a(b)(1); *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) ("The state agency physicians' opinions were consistent with the other medical evidence and it was proper for the ALJ to rely on them, in part, in formulating Mabry's RFC."); *Stormo v. Barnhart*, 377 F.3d 801, 807–08 (8th Cir. 2004) (the ALJ properly used evidence from state agency doctors in supporting the finding that the claimant's mental impairments were not disabling); *Kamann v. Colvin*, 721 F.3d 945, 951 (8th Cir. 2013) ("Contrary to Kamann's assertion that the record contained insufficient evidence to support a RFC determination, we find the ALJ thoroughly reviewed years of medical evidence on record and issued a finding consistent with the views of Dr. Pressner, the reviewing agency psychologist.").

The ALJ concluded that Sexton had the following non-exertional limitations due to his mental impairments:

> can understand, remember, and carry out simple instructions consistent with routine, repetitive unskilled work at SVP 1 and SVP 2. He can maintain attention to tasks for periods of 2-hour segments. He can tolerate occasional contact with co-workers and supervisors, but no contact with the general public, in a setting where he completes tasks relatively independently and where social interaction is not a primary job requirement, in an occupation where there are no strict production quotas and he would not be subject to the demands of fast-paced production work (i.e., work by the shift, not by the hour). He can perform simple decision making related to basic work functions. He can tolerate minor, infrequent changes in the workplace. He would likely be off task about 5 percent of the workday.

(Tr. 21.)

RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and the claimant's description of his limitations. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *See Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001); *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).

In addition to the medical evidence discussed above, the ALJ considered that Sexton was able to engage in most activities of daily living despite his impairments. Specifically, Sexton testified that he was able to perform self-care independently, with some reminders to do so more often; prepare simple meals; obtain and maintain a driver's license; leave home alone; perform household chores; visit a friend in another town regularly; play video games with friends; care for a foster pet; shop for groceries with his mother; attend church sometimes; and stay in touch with others via telephone. (Tr. 24, 39, 46-51, 224-27.) Most significantly, Sexton testified that he worked part-time at an animal shelter and volunteered on days he was not working. (Tr. 24, 39-40, 51.)

The ALJ stated that she recognized that, given Sexton's diagnoses and associated

symptoms, he would likely experience some anxiety and depressive symptoms, particularly when under stress or interacting with others. (Tr. 23.) She therefore credited these symptoms with limiting his capabilities in the RFC. *Id.* The ALJ further stated that she had credited some limitations in attending due to Sexton's history of ADHD. *Id.* The ALJ concluded that, although the evidence supports these limitations, it does not support Sexton's allegations that his symptoms are so pervasive as to be disabling. *Id.*

The undersigned finds that the ALJ provided good reasons for discrediting portions of Dr. Kodela's opinions, and assigning significant weight to the opinion of Dr. Hutson. The ALJ incorporated significant non-exertional limitations in Sexton's RFC. Although she did not adopt Dr. Hutson's opinion in full, she still found that Sexton could only maintain attention to tasks for two-hour segments. The ALJ incorporated substantial social limitations consistent with the medical record and Sexton's testimony demonstrating difficulties with social interactions. The ALJ also limited Sexton to jobs not requiring strict production quotas or fast-paced production work consistent with Sexton's hearing testimony that he had been terminated from a full-time production position because he was not fast enough. (Tr. 58.) The ALJ determined, with the assistance of a vocational expert, that Sexton was able to perform jobs existing in the national economy despite the presence of these limitations.

The RFC determined by the ALJ is supported by substantial evidence on the record as a whole. It is supported by Dr. Kodela's treatment notes revealing Sexton's symptoms were well-controlled with medication, Dr. Hutson's opinion, treatment notes from Sexton's therapist reflecting Sexton's desire to work, Sexton's statement to a counselor that he could work with small groups of people, and Sexton's testimony regarding his daily activities including his ability to work part-time and volunteer on a regular basis. This evidence supports the ALJ's

determination that Sexton retains the ability to perform a range of simple work with limited social contact despite his mental impairments.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of September, 2019.